Approved: _____   ORIGINAL
         Cecilia E. Vogel
         Assistant United States Attorney

Before:   HONORABLE BARBARA C. MOSES
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - x   **19MAG .3793**

UNITED STATES OF AMERICA          :   **COMPLAINT**
                                  :
         - v. -                   :   Violation of
                                  :   21 U.S.C. § 846
WILLY SANCHEZ, JAIRO RAMON MENA   :
HERNANDEZ, and JUAN LUIS ALMANZAR :
HERNANDEZ,                        :
                                  :
         Defendants.              :
                                  :
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

   MATTHEW WISDOM, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA") and charges as follows:

<u>COUNT ONE</u>
(Narcotics Conspiracy)

   1.   From at least in or about February 2019, up to and including in or about April 2019, in the Southern District of New York and elsewhere, WILLY SANCHEZ, JAIRO RAMON MENA HERNANDEZ, and JUAN LUIS ALMANZAR HERNANDEZ, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

   2.   It was a part and an object of the conspiracy that WILLY SANCHEZ, JAIRO RAMON MENA HERNANDEZ, and JUAN LUIS ALMANZAR HERNANDEZ, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substances that WILLY SANCHEZ, JAIRO RAMON MENA HERNANDEZ, and JUAN LUIS ALMANZAR HERNANDEZ, the defendants, conspired to distribute and possess with intent to distribute were (i) five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A); (ii) 40 grams and more of mixtures and substances containing a detectable amount of fentanyl, in violation of Title 21, United States Code, Section 841(b)(1)(B); and (iii) mixtures and substances containing a detectable amount of heroin, in violation of Title 21, United States Code, Section 841(b)(1)(C).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and for the foregoing charge are, in part, as follows:

4. I am a Special Agent with the DEA and I have been personally involved in the investigation of this matter. This affidavit is based upon my personal participation in the investigation of this matter, and my conversations with law enforcement agents and witnesses as well as a review of documents and recordings. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

### CS-1's Source of Supply

5. Based on my conversations with a Confidential Source ("CS-1")[1], I have learned the following, in substance and in part:

a. For at least approximately the past two years, CS-1 sold cocaine in the vicinity of Yonkers, New York.

---

[1] CS-1 is charged with a narcotics offense, among other things, and has met with the Government to proffer in the hope of obtaining leniency at sentencing. Information provided by CS-1 has proven reliable and has been corroborated in part by other sources, such as phone records and surveillance by law enforcement.

2

b.  CS-1's source of supply for the cocaine was "Wendi." As described below, law enforcement later identified Wendi as WILLY SANCHEZ, the defendant. Approximately nine months ago, CS-1 was introduced to SANCHEZ through another narcotics dealer.

c.  CS-1 called SANCHEZ whenever he wanted to get narcotics to sell. CS-1 used to pick up the narcotics he ordered from SANCHEZ in the vicinity of West 181st Street in Manhattan, New York (the "Meeting Location"), at night, and he delivered payment to SANCHEZ at the Meeting Location at night. SANCHEZ generally sent others to meet with CS-1 to provide the drugs to CS-1 or pick up payment. SANCHEZ did not permit CS-1 to come to the apartment where SANCHEZ kept his supply of narcotics, but CS-1's understanding based on his conversations with SANCHEZ was that the apartment where SANCHEZ stored narcotics was in the vicinity of the Meeting Location.

d.  CS-1 has previously met SANCHEZ in person, and CS-1 purchased cocaine from SANCHEZ approximately once to twice per month up until December 2018, when CS-1 was arrested.

### *The Drug Mill in Manhattan*

6.  On or about February 5, 2019, Magistrate Judge Henry B. Pitman signed a Warrant and Order for Prospective and Historical Location Information and Pen Register Information for a cellphone ending in 3203 (the "Sanchez Cellphone"), which was believed to be used by "Wendi," *i.e.*, WILLY SANCHEZ, the defendant, based on information provided by CS-1 and toll record analysis. On or about February 19, 2019, Magistrate Judge Ona T. Wang signed a Warrant and Order for use of a cell-site simulator to locate the Sanchez Cellphone. Based on location information obtained pursuant to these two warrants, physical surveillance conducted by law enforcement, and video surveillance, I have learned the following, in substance and in part:

a.  A particular apartment building in the vicinity of West 178th Street and Wadsworth Avenue in Manhattan ("Building-1") is located within approximately several blocks of the Meeting Location.

b.  The Sanchez Cellphone has been located in the vicinity of Building-1 approximately daily between approximately 7:00 p.m. and 2:00 a.m. I have observed SANCHEZ fist bumping security guards working at Building-1 and greeting

a young woman as he entered Building-1. Other law enforcement officers have observed SANCHEZ go to the 30th floor of Building-1, an apartment on the 26th floor, and the 29th floor. SANCHEZ, however, does not reside at Building-1.

    c. On or about February 28, 2019, at approximately 12:53 a.m., SANCHEZ entered Building-1 with a large trash bag, weighted down and slung over his shoulder. Given the late hour, my observations of the trash bag, and my training and experience and involvement in the investigation, I believe SANCHEZ was carrying drug paraphernalia in the trash bag. SANCHEZ entered an elevator in Building-1 that did not have video surveillance. At approximately 1:59 a.m. on or about February 28, 2019, on the 27th floor of Building-1, SANCHEZ entered an elevator with video surveillance holding a small blue weighted bag in his hand, and he subsequently exited Building-1.

    d. On or about March 5, 2019, at approximately 7:35 p.m., law enforcement observed SANCHEZ getting into a vehicle with another individual in the vicinity of Building-1 and the Meeting Location. After a few minutes, SANCHEZ exited the vehicle, walked to Building-1, and entered Building-1. The vehicle drove to the vicinity of West 157th Street in Manhattan, and the driver handed a squared-off brick-like object to a Hispanic male at that location. Based on my training, experience, and involvement in this investigation, I believe the driver handed over a kilogram of narcotics.

    e. On or about March 5, 2019, within approximately one hour after SANCHEZ entered Building-1, while I was conducting surveillance of Building-1, I observed a male, later identified by law enforcement as explained below as JAIRO RAMON MENA HERNANDEZ, the defendant, exit Building-1 and then proceed to look into vehicles parked in the vicinity as if to see who was in the vehicles. MENA HERNANDEZ looked at my vehicle and then walked to the vicinity of West 178th Street and Wadsworth Avenue and continued to watch the back of my vehicle for approximately one minute. As I left the area, I observed MENA HERNANDEZ walk eastbound on West 178th Street. MENA HERNANDEZ then returned a few minutes later and entered Building-1. Based on my training, experience, and observations of MENA HERNANDEZ, I believe MENA HERNANDEZ was conducting counter-surveillance to detect the presence of law enforcement. Based on my training and experience, I know that individuals involved in narcotics trafficking often conduct counter-surveillance when engaging in narcotics transactions in order to prevent detection by law enforcement.

f.  On or about March 6, 2019, at approximately 9:15 p.m., law enforcement observed MENA HERNANDEZ exit Building-1 and then look into vehicle windows in the surrounding area. Law enforcement observed MENA HERNANDEZ spot my vehicle, at which point MENA HERNANDEZ immediately started speaking on his cellphone. MENA HERNANDEZ crossed the street to West 178th Street and Wadsworth Avenue and continued to watch my vehicle while speaking on his cellphone. I drove slowly north on Wadsworth Avenue, and MENA HERNANDEZ continued to watch my vehicle while speaking on his cellphone. Once my vehicle was out of view, law enforcement observed MENA HERNANDEZ walk eastward on 178th Street for approximately several minutes before re-entering Building-1. Based on my training and experience, and law enforcement's observations of MENA HERNANDEZ, I believe MENA HERNANDEZ was conducting counter-surveillance to detect the presence of law enforcement.

7.  On or about March 7, 2019, law enforcement installed a camera (the "Law Enforcement Camera") on the 27th floor of Building-1. The Law Enforcement Camera was positioned to capture in view the door to a particular apartment on that floor ("Apartment-1") and the surrounding hallway. Based on video obtained from the Law Enforcement Camera, and my conversations with other law enforcement officers who have watched that video and other video surveillance obtained from Building-1 and who have conducted physical surveillance in the vicinity of Building-1, I have learned the following, in substance and in part:

a.  On or about March 7, 2019, at approximately 3:36 p.m., JAIRO RAMON MENA HERNANDEZ, the defendant, entered Apartment-1. At approximately 11:39 p.m., a different male later identified by law enforcement, as described below, as JUAN LUIS ALMANZAR HERNANDEZ, the defendant, left Apartment-1 holding a small black bag. Less than ten minutes later, at approximately 11:46 p.m., ALMANZAR HERNANDEZ returned to Apartment-1 empty-handed. At approximately 12:42 a.m., ALMANZAR HERNANDEZ left Apartment-1 again.

b.  On or about March 11, 2019, at approximately 6:25 p.m., MENA HERNANDEZ entered Apartment-1 with a small white bag. At approximately 8:26 p.m., MENA HERNANDEZ left Apartment-1 with a small black bag. At approximately 8:35 p.m., ALMANZAR HERNANDEZ left Apartment-1, threw away trash down a trash chute, and walked empty-handed to the elevators and exited the 27th floor. At approximately 8:54 p.m., MENA HERNANDEZ and ALMANZAR

5

HERNANDEZ returned to Apartment-1 together, and MENA HERNANDEZ was holding a white bag.

          c. On or about March 12, 2019, at approximately 5:21 p.m., MENA HERNANDEZ entered Apartment-1 with a black plastic bag that appeared to contain a gallon bottle of water and a white substance, and he had in his hand what appeared to be another gallon water bottle. Approximately several minutes later, MENA HERNANDEZ left Apartment-1 with a cellphone in hand and exited Building-1. At approximately 5:58 p.m., MENA HERNANDEZ re-entered Building-1 with a cellphone in hand, and he took an elevator to the 17th floor. At approximately 7:58 p.m., MENA HERNANDEZ re-entered Apartment-1. At approximately 8:06 p.m., a third unknown individual ("FNU LNU-1") entered Apartment-1 using a key and carrying a small plastic bag.

          d. On or about March 12, 2019, at approximately 11:15 p.m., MENA HERNANDEZ again left Apartment-1, with a cellphone in hand. At approximately 11:17 p.m., ALMANZAR HERNANDEZ left Apartment-1 with a box under his arm. MENA HERNANDEZ exited Building-1 followed shortly by ALMANZAR HERNANDEZ, who was carrying the box. Within minutes, MENA HERNANDEZ re-entered Building-1, followed shortly thereafter by ALMANZAR HERNANDEZ, who was no longer carrying a box. At approximately 11:25 p.m., MENA HERNANDEZ took an elevator to the 27th floor. At approximately 11:26 p.m., ALMANZAR HERNANDEZ entered a separate elevator with another individual, and ALMANZAR HERNANDEZ pressed the button for the 30th floor. After the individual exited the elevator, ALMANZAR HERNANDEZ pressed the button for the 27th floor. At approximately 11:26 p.m., MENA HERNANDEZ returned to Apartment-1. At approximately 11:27 p.m., ALMANZAR HERNANDEZ returned to Apartment-1. Based on my training and experience and law enforcement's observations during this investigation, I believe that when MENA HERNANDEZ left Apartment-1 approximately two minutes before ALMANZAR HERNANDEZ, he was going to act as a look-out for law enforcement for a narcotics transaction involving ALMANZAR HERNANDEZ.

          e. On or about March 13, 2019, at approximately 12:47 a.m., MENA HERNANDEZ and ALMANZAR HERNANDEZ both left Apartment-1, with FNU LNU-1, and MENA HERNANDEZ locked the door of Apartment-1.

          f. On or about April 9, 2019, at approximately 7:09 p.m., MENA HERNANDEZ entered Apartment-1 using a key. At approximately 8:07 p.m., ALMANZAR HERNANDEZ entered Apartment-1 using a key. At approximately 8:15 p.m., MENA HERNANDEZ left

6

Apartment-1 with a cellphone in hand and exited Building-1. MENA HERNANDEZ walked from Wadsworth Avenue toward 179th Street and crossed to the north side of 179th Street and continued to walk east on 179th Street, and in the vicinity of where MENA HERNANDEZ was walking, there were several occupied parked vehicles with their lights on. Law enforcement momentarily lost sight of MENA HERNANDEZ while the law enforcement officer conducting surveillance ("Agent-1") changed location in an effort to get a better view of MENA HERNANDEZ. Agent-1 subsequently observed MENA HERNANDEZ on the northeast corner of 179th Street and Wadsworth Avenue, and MENA HERNANDEZ crossed Wadsworth Avenue and entered Building-1 with a cellphone in hand. At approximately 8:28 p.m., MENA HERNANDEZ entered Apartment-1 and appeared to use the knocker on the door, with a cellphone in hand. At approximately 10:38 p.m., MENA HERNANDEZ left Apartment-1. At approximately 10:39 p.m., another individual ("FNU LNU-2") entered Apartment-1 carrying a brown shopping bag. At approximately 10:55 p.m., MENA HERNANDEZ re-entered Apartment-1 using a key. At approximately 11:28 p.m., FNU LNU-2 left Apartment-1 without any bag.

        g.  On or about April 9, 2019, at approximately 11:48 p.m., MENA HERNANDEZ left Apartment-1 with a cellphone in hand. At approximately 11:51 p.m., ALMANZAR HERNANDEZ left Apartment-1 carrying a box. At approximately 11:56 p.m., MENA HERNANDEZ re-entered Apartment-1 using a key. At approximately 12:13 a.m., ALMANZAR HERNANDEZ approached the door of Apartment-1, appeared to use the knocker on the door, and re-entered Apartment-1 empty-handed. At approximately 12:32 a.m., MENA HERNANDEZ and ALMANZAR HERNANDEZ exited Apartment-1, and MENA HERNANDEZ locked the door of Apartment-1. Based on my training and experience and law enforcement's observations during this investigation, I believe that when MENA HERNANDEZ left Apartment-1 approximately three minutes before ALMANZAR HERNANDEZ, he was going to act as a look-out for law enforcement for a narcotics transaction involving ALMANZAR HERNANDEZ.

        h.  On or about April 16, 2019, at approximately 2:15 a.m., WILLY SANCHEZ, the defendant, MENA HERNANDEZ, ALMANZAR HERNANDEZ, and FNU LNU-1 left Apartment-1 at the same time. MENA HERNANDEZ and ALMANZAR HERNANDEZ were each carrying several shopping bags, and MENA HERNANDEZ threw his bags down the trash chute on the 27th floor. SANCHEZ, MENA HERNANDEZ, ALMANZAR HERNANDEZ, and FNU LNU-1 entered the elevator on the 27th floor together. MENA HERNANEZ exited the elevator on the 17th floor. SANCHEZ, ALMANZAR HERNANDEZ, and FNU LNU-1 then left Building-1 at the same time.

8.     Based on lease paperwork obtained for Apartment-1, I have learned that Apartment-1 is leased to a female individual ("Female-1"). Based on information provided by a confidential source ("CS-2"),[2] I have learned that Apartment-1 is leased in a fictitious name. In addition, open source searches reveal that the occupants of Apartment-1 are a male ("Male-1") and different female individual ("Female-2"), and no occupants are listed as Female-1. Moreover, based on searches conducted in various law enforcement databases, I believe that Female-1 is a fictitious identity.

### *The Search of Apartment-1 and Arrests of the Defendants*

9.     On or about April 12, 2019, Magistrate Judge Sarah Netburn signed a Search Warrant and Order authorizing a search of Apartment-1 (the "April Search Warrant").

### The Traffic Stop

10.    Based on video obtained from the Law Enforcement Camera and my conversations with other law enforcement officers who have watched that video and other video surveillance obtained from Building-1, and based on physical surveillance conducted by myself and other law enforcement officers in the vicinity of Building-1, I have learned the following, in substance and in part:

a.     On or about April 16, 2019, at approximately 4:10 p.m., FNU LNU-1 entered Apartment-1 using a key; FNU LNU-1 was not carrying anything when he entered Apartment-1. FNU LNU-1 left Apartment-1 and Building-1 approximately two hours later with a cellphone in hand.

b.     On or about April 16, 2019, at approximately 7:07 p.m., JAIRO RAMON MENA HERNANDEZ, the defendant, entered Apartment-1 using a key. Several minutes later, at approximately 7:09 p.m., MENA HERNANDEZ exited Apartment-1 carrying an Amazon box (the "Amazon Box") and left Building-1. MENA HERNANDEZ, carrying the Amazon Box, met a male individual (the "Passenger")

---

[2] CS-2 has been a paid DEA informant for approximately twenty years. Information provided by CS-2 has previously been found to be reliable, and CS-2's information here has been corroborated by other sources, as described above in paragraph 8.

8

in the vicinity of Building-1 and walked with the Passenger westbound on 179th Street. While walking, MENA HERNADEZ handed the Amazon Box to the Passenger. The Passenger and MENA HERNANDEZ approached a vehicle ("Vehicle-1") parked on West 179th Street, and the Passenger entered the front passenger seat of Vehicle-1. MENA HERNANDEZ walked away southbound on Broadway.

    c. Vehicle-1 pulled onto West 179th Street without signaling and drove to the ramp for the George Washington Bridge. Vehicle-1 pulled into traffic on the ramp for the George Washington Bridge without signaling. Law enforcement conducted a traffic stop of Vehicle-1. As a law enforcement officer ("Agent-2") approached Vehicle-1 on foot, Agent-2 observed the Amazon Box in the back seat, partially opened, with U.S. currency protruding from the Amazon Box. The driver of Vehicle-1 (the "Driver") and the Passenger consented to a search of Vehicle-1. Inside the Amazon Box, law enforcement found approximately $500,000 in U.S. currency.

### The Search of Apartment-1 and Arrests of JAIRO RAMON MENA HERNANDEZ and JUAN LUIS ALMANZAR HERNANDEZ

    11. Based on video obtained from the Law Enforcement Camera and my conversations with other law enforcement officers who have watched that video and other video surveillance obtained from Building-1, and based on physical surveillance conducted by myself and other law enforcement officers in the vicinity of Building-1, I have learned the following, in substance and in part:

    a. After delivering the Amazon Box to the Passenger, JAIRO RAMON MENA HERNANDEZ, the defendant, was observed by law enforcement walking southbound on Broadway and then eastbound on 176th Street, in the vicinity of Building-1. Law enforcement also observed JUAN LUIS ALMANZAR HERNANDEZ, the defendant, walking separately toward Building-1 and placed him under arrest. Subsequently, law enforcement arrested MENA HERNANDEZ in the vicinity of Building-1. During a search incident to arrest, law enforcement recovered keys from MENA HERNANDEZ's person.

    b. Law enforcement subsequently entered Apartment-1 using one of the keys recovered from MENA HERNANDEZ's person. Law enforcement searched Apartment-1, which is a one-bedroom apartment, pursuant to the April Search

Warrant. Law enforcement found the following items, among other things, in Apartment-1:

      i.      Several duffel bags were in the bedroom closet containing white brick-like packages individually vacuum-sealed in clear plastic. Based on my training, experience, and involvement in this investigation, I believe that the brick-like packages each contain approximately one kilogram of cocaine.

      ii.      In the bedroom closet, there was a plastic bag containing approximately 8,000 blue pills in approximately thirteen clear plastic bags marked with numbers, such as "1,000" or "500." Based on my training and experience, I believe the pills appear to be fentanyl pills, and that the number markings on the bags indicate the number of pills in each bag. Based on my training, experience, and observations of the pills, I believe that the bags contain pills amounting to at least approximately over 40 grams of fentanyl.

      iii.      The plastic bag in the bedroom closet also contained approximately two clear plastic bags containing an off-white powder. Based on my training, experience, and involvement in this investigation, including the fact that this clear plastic bag containing the off-white powder was recovered in the same bag containing the fentanyl pills, I believe that the off-white powder contained in these clear plastic bags is heroin.

      iv.      In a dresser drawer in the bedroom, there was a wad of U.S. currency wrapped in a rubber band.

      v.      In a hallway closet, there was a plastic bag containing white brick-like packages individually vacuum-sealed in clear plastic. Based on my training, experience, and involvement in this investigation, I believe that the brick-like packages each contain approximately one kilogram of cocaine.

      vi.      In another hallway closet, there were several empty boxes, including an Amazon box.

c. Law enforcement officers field tested the substance contained in one of the brick-like packages recovered from Apartment-1, and it tested positive for cocaine. Law enforcement recovered approximately twenty-one brick-like packages from the bedroom and hallway closets, collectively.

d. Law enforcement did not observe any individuals entering or leaving Apartment-1 between approximately 2:15 a.m. on April 16, 2019, when WILLY SANCHEZ, the defendant, MENA HERNANDEZ, ALMANZAR HERNANDEZ, and FNU LNU-1 left Apartment-1, and approximately 4:10 p.m. on April 16, 2019, when FNU LNU-1 entered Apartment-1, and approximately 7:07 p.m., when MENA HERNANDEZ entered Apartment-1. Accordingly, based on my training, experience, and involvement in the investigation, I believe that the bags containing the narcotics found in Apartment-1 were in Apartment-1 at the time SANCHEZ, MENA HERNANDEZ, ALMANZAR HERNANDEZ, and FNU LNU-1 left Apartment-1 on April 16, 2019, at approximately 2:15 a.m.

e. Law enforcement seized ALMANZAR HERNANDEZ's cellphone incident to his arrest, and Agent-1 had the cellphone in his possession when the cellphone rang and indicated on the screen that it was receiving a call from "Wendy." As discussed above, "Wendi" has been identified as SANCHEZ.

f. In addition, law enforcement seized ALMANZAR HERNANDEZ's keys from his person incident to his arrest. Among ALMANZAR HERNANDEZ's keys, law enforcement identified a key that appears to be identical to MENA HERNANDEZ's key to Apartment-1.

### Arrest of WILLY SANCHEZ

12. Based on my involvement in this investigation and my conversations with other law enforcement officers, I have learned the following, in substance and in part:

a. On or about April 16, 2019, after conducting the search of Apartment-1, law enforcement officers went to a residence in the Bronx, New York, believed to be a residence for WILLY SANCHEZ, the defendant, and waited outside of the residence. SANCHEZ and an individual believed to be his

11

girlfriend (the "Girlfriend") drove up to the residence in a vehicle ("Vehicle-2"); the Girlfriend was driving and SANCHEZ was in the passenger seat. At the residence, Vehicle-2 stopped, and SANCHEZ began to exit Vehicle-2 in order to enter a code to enter a parking garage for the residence, and as SANCHEZ was exiting Vehicle-2, law enforcement officers approached SANCHEZ and identified themselves as law enforcement. In response, SANCHEZ quickly reached back into Vehicle-2 toward the center console. Law enforcement pulled SANCHEZ out of Vehicle-2 and arrested him. Standing outside of Vehicle-2, law enforcement officers observed U.S. currency in Vehicle-2 near the center console.

    b. The Girlfriend stated, in substance and in part, that Vehicle-2 belonged to her, and she gave consent to search Vehicle-2. Law enforcement found approximately $10,000 in U.S. currency near the center console of Vehicle-2.

    c. After waiving his *Miranda* rights, SANCHEZ agreed to be interviewed by law enforcement. SANCHEZ stated, in sum and substance, that he was the owner of the $10,000 recovered from Vehicle-2.

    d. In addition, during the interview, law enforcement officers showed SANCHEZ a still image of the video surveillance from the Law Enforcement Camera showing SANCHEZ, JAIRO RAMON MENA HERNANDEZ, and JUAN LUIS ALMANZAR HERNANDEZ, the defendants, in the hallway of the 27th floor of Building-1 on or about April 16, 2019, at approximately 2:15 a.m., having just exited Apartment-1. SANCHEZ identified himself in the video still. SANCHEZ stated, in substance and in part, that he knew the two individuals in the video still, *i.e.*, MENA HERNANDEZ and ALMANZAR HERNANDEZ, from Building-1, and he claimed that the video still showed the three of them on the lobby floor of Building-1. SANCHEZ denied knowing anything about Apartment-1 and denied any involvement in or knowledge of narcotics activity.

    e. Law enforcement officers subsequently used a drug detecting canine to conduct a sniff of the $10,000 in U.S. currency that had been recovered from Vehicle-2, and the canine

indicated a positive alert for the presence of narcotics on the $10,000 in U.S. currency.

    f. During the course of their arrests, SANCHEZ, MENA HERNANDEZ, and ALMANZAR HERNANDEZ provided identification documents to law enforcement.

WHEREFORE, deponent respectfully requests that WILLY SANCHEZ, JAIRO RAMON MENA HERNANDEZ, and JUAN LUIS ALMANZAR HERNANDEZ, the defendants, be imprisoned or bailed, as the case may be.

_____
Matthew Wisdom
Special Agent
Drug Enforcement Administration

Sworn to before me this
17th day of April, 2019

_____
THE HONORABLE BARBARA C. MOSES
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK